UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| Lee Anderson Hepler and, ) | Case No. 21-50495 |
| RaDonna Ruth Hepler, ) | |
| ) | |
| Debtors. ) | Chapter 7 |
| _____) | |
| ) | |
| Daniel C. Bruton, Trustee, and ) | |
| William P. Miller, United States ) | |
| Bankruptcy Administrator, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adv. Pro. No. 22-06003 |
| ) | |
| Lee Anderson Hepler and ) | |
| RaDonna Ruth Hepler, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MEMORANDUM OPINION**

This adversary proceeding came before the Court for trial in Winston-Salem, North Carolina on February 2, 2023 on a complaint objecting to discharge. The chapter 7 trustee and the United States Bankruptcy Administrator (the "Plaintiffs") object to the discharges of Lee and RaDonna Hepler (the "Debtors") in their chapter 7 case. In the complaint, the Plaintiffs assert two claims: (1) the Debtors knowingly and fraudulently made a false oath or account and withheld recorded information from an officer of the estate, and should be denied discharges under 11 U.S.C.

1

§ 727(a)(4),[1] and (2) the Debtors, without justification, concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which the Debtors' financial condition might be ascertained, warranting denial of discharge under § 727(a)(3).[2]

After considering the pleadings, evidence, and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## JURISDICTION

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 83.11 entered by the United States District Court for the Middle District of North Carolina. This is a core

---

[1] All citations to statutory sections refer to Title 11 of the United States Code, unless otherwise indicated.

[2] At the conclusion of the trial, the Plaintiffs orally moved to amend the Complaint pursuant to Federal Rule of Civil Procedure 15(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7015, to add an additional cause of action under 11 U.S.C. § 727(a)(2). The Plaintiffs asserted that they had "actually tried (a)(3) and (a)(2) here today," and that the Complaint should be amended "to take both of those into account under [section] 727." (Docket No. 26). Rule 15 provides that "an issue not raised by the pleadings" will be treated as if it were raised, provided it is "tried by the parties' express or implied consent." FED. R. CIV. P. 15(b)(2). Rule 15(b)(2) "does not offer a failsafe for any and every faulty pleading." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 983 (4th Cir. 2015). "Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them." *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 901 (4th Cir. 1996). Here, the Court cannot find the Defendants consented to trial of the § 727(a)(2) claim. There is no evidence that the Defendants expressly consented to trial of that claim in the pre-trial disclosures or stipulations. Admission, without objection, of evidence in support of a § 727(a)(2) claim cannot establish implied consent because the evidence was also "germane" to the Plaintiffs' § 727(a)(4) claim expressly made in the Complaint. *Dan Ryan Builders*, 783 F.3d at 984. The Court is also unable to find, under the circumstances, that the Debtors received fair notice. The Plaintiffs did not make explicit their intention to pursue the § 727(a)(2) claim until the close of trial, instead submitting the evidence without any indication as to its intended use for that specific claim. *See Williams v. Williams*, No. 1:20CV904, 2021 WL 3679613, at *9 (M.D.N.C. Aug. 19, 2021). Moreover, the Plaintiffs' pre-trial brief inaccurately stated that the original Complaint itself sought claims under § 727(a)(2) and (a)(4). (Docket No. 23, ¶ 15). For these reasons, the Trustee's oral Rule 15(b) motion is denied.

proceeding under 28 U.S.C. § 157(b)(2), which this Court may hear and determine, and the parties have consented to this Court's adjudication of the Plaintiffs' claims.

## FACTUAL BACKGROUND

The Court makes the following findings of fact based on the evidence presented at trial, including the testimony of the chapter 7 trustee and Lee Hepler, or as otherwise established in the record of this case and in the stipulated facts (Docket No. 25) submitted by the parties.[3] The Court recites only those facts relevant to the claims and defenses at issue.

The Debtors initiated their case on July 30, 2021, by filing a voluntary petition under chapter 7 of the Bankruptcy Code. Daniel C. Bruton was appointed as chapter 7 trustee (the "Trustee").

In the Debtors' bankruptcy schedules (Case No. 21-50495, Docket No. 1),[4] the Debtors listed a tenancy by the entirety ownership interest in 405 Wake Drive, Salisbury, North Carolina (the "Property"), which they valued at $270,900.00. The Debtors listed three liens on the Property: a first mortgage held by USAA Federal Savings Bank in the amount of $101,426.64; a second mortgage held by Wells Fargo Bank, N.A., in the amount of $48,311.81; and a third deed of trust held by the Estate of Betty Solomon Proctor (the "Proctor Estate") in the amount of $72,361.50. Based on the liens listed in the schedules, the Debtors appeared to hold

---

[3] The Plaintiffs called Lee Hepler as their own witness; the Court notes that the Debtors did not call any witnesses, did not submit any evidence at trial, and did not file a pre-trial brief.

[4] Unless otherwise indicated, the record citations refer to the Adversary Proceeding, A.P. No. 22-06003, rather than the underlying bankruptcy case, Case No. 21-50495.

3

approximately $48,800.05 of unencumbered equity in the Property; however, each of the Debtors also claimed a $24,400.03 homestead exemption in the Property, eliminating the equity otherwise subject to the claims of creditors. (Docket No. 25, ¶¶ 5, 7). Therefore, based on the valuations, lien amounts, and claimed exemptions, the Debtors' bankruptcy schedules suggested that there was no equity in the Property for the benefit of creditors and the bankruptcy estate. (Docket No. 25, ¶ 8).[5]

Mr. Hepler's mother, Betty Proctor, had died on September 30, 2020. (Docket No. 25, ¶ 4). At the time of the Debtors' bankruptcy filing, the Proctor Estate was being administered in Rowan County, North Carolina, with Mr. Hepler's sister, Ellen Stone, serving as administrator. As the only heirs, Mr. Hepler and Ms. Stone each held a 50 percent intestacy interest in the Proctor Estate. The Debtors listed Mr. Hepler's intestacy interest in Schedule A with an "unknown" value but did not explicitly connect that interest to the deed of trust, or the amount therein, held by the Proctor Estate on the Property. (Case No. 21-50495, Docket No. 1, p. 14).

Mr. Hepler appeared and testified at the Debtors' first § 341 meeting of creditors held on September 3, 2021. Mrs. Hepler did not personally appear, but Mr. Hepler testified on her behalf through a power of attorney. (Docket No. 25, ¶ 10). Mr. Hepler affirmed that the testimony he offered at the § 341 meeting was

---

[5] At trial, the Trustee testified that his initial impression of the Debtors' bankruptcy filing was that it "was probably going to be a no-asset case," explaining that, "if you take all these numbers at face value, there's no equity for the benefit of the estate in [the Property]." (Docket No. 26).

4

truthful; he also testified that the information contained in the bankruptcy schedules was true and accurate. (Ex. 15, pp. 3:9-13, 4:10-17).

Upon questioning from the Trustee, Mr. Hepler confirmed that the Proctor Estate's deed of trust secured a promissory note executed by the Debtors in favor of Ms. Proctor. Mr. Hepler and his attorney, however, indicated that the amount of the Proctor Estate's secured claim stated in Schedule D represented only half of the face amount owed on the promissory note, which was $144,723.00 as of the petition date. (Ex. 15, pp. 9:3-9, 12:15-17).[6]

Mr. Hepler further stated that the Debtors had never made any payments on the note because of the expectation that Ms. Proctor would forgive portions of the note on an annual basis, explaining that "[Ms. Proctor] was going to forgive so much a year on [the note], but she never got a chance to do that, because two – two years after we – the inception of that note she died." (Ex. 15, p. 8:8-11).

In discussing the validity and amount of the debt owed to the Proctor Estate, Hepler and his counsel, Stan Dick, had the following exchange with the Trustee:

> Mr. Dick: But the note doesn't call for payments. It just has a date out into the future, because it was assumed by all the parties that it would just wash out in terms of gifts over the length of the note.
>
> Mr. Bruton: Well – well, if it's a gift that's not supposed to get paid back, then the deed of trust doesn't exist. I mean, you can't have it both ways.

---

[6] At the § 341 meeting, the Debtors' attorney stated that he scheduled only half of the amount owed on the promissory note under the belief that, because the Debtor was a one-half beneficiary of the Proctor Estate, "it's going to kind of wash in terms of his share of the estate." (Ex. 15, p. 9:3-9). While a more fulsome analysis of that position is unnecessary to resolving the Plaintiffs' claims at issue here, the counsel's erroneous assessment of the interplay between the probate estate and the bankruptcy estate ignores, among other things, the potential impact on the Debtors' claimed exemptions as well as the nonexempt funds that could be available to creditors.

> Mr. Dick:  Well, there – there's an existent deed of trust. The –
>
> Mr. Bruton:  – and it's a valid –
>
> Mr. Dick:  – The gifts were never made because she passed away.
>
> Mr. Bruton: All right. All right, hold on. So it's a valid debt?
>
> Mr. Dick:  It's a valid debt, yes.
>
> ….
>
> Mr. Bruton:  All right. What's your intentions or – is it your presumption that this money never has to be paid or …
>
> Mr. Hepler:  No. I – I assume that my sister is going to want half and she may be –
>
> Mr. Bruton:  – Well, the – the half – I don't know where you get from the half. I mean, you owe a hundred percent.
>
> Mr. Hepler:  Yeah, sure.

(Ex. 15, pp. 11:8-25, 12:1, 13:14-22).

Based on the information the Trustee obtained at the § 341 meeting regarding the total amount of the debt owing to the Proctor Estate – $144,723 – as well as realtor-supplied valuations of the Property suggesting a higher market value than what the Debtors listed in Schedule A, the Trustee commenced efforts to list the Property for sale. To that end, the Trustee filed an application to employ a broker and a motion for turnover of the Property. The Trustee also filed a notice of assets and a request for creditors to file proofs of claim. (Case No. 21-50495, Docket Nos. 9, 22, 23).

Through his subsequent efforts to administer the estate, and despite the Debtors' representations in the schedules and testimony at the § 341 meeting that the $144,723 debt owed to the Proctor Estate was valid, the Trustee learned of the existence of a loan forgiveness document purportedly executed by Ms. Proctor before

6

her death. The Trustee testified that he was provided with a copy of this document by Ms. Stone in September of 2021:

> Mr. Bruton: [Stone] also mentioned that there was a document that purported to forgive the debt. It was her opinion that it was a fraudulent document. And I asked her if she had a copy, and she did. I asked her to forward me a copy, and she did.
>
> ….
>
> Mr. Price: So had that document been filed with the Court before that time?
>
> Mr. Bruton: No.
>
> Mr. Price: Had you received that document from the debtors or from Mr. Dick prior to that time.
>
> Mr. Bruton. No.
>
> Mr. Price: In fact, the only knowledge you had of that document was that Ms. Stone had sent it to you saying I think this is invalid?
>
> Mr. Bruton: Correct.

(Docket No. 26).

In December 2021, the Trustee obtained an offer to purchase the Property for $330,000.00, and he also filed a motion to compromise and settle the Proctor Estate's claim. Under the basic terms of that proposed settlement, the Trustee would have paid the Proctor Estate $74,266.86 in full satisfaction of its promissory note and deed of trust, with the Trustee retaining the balance of $70,456.14—the amount he asserted would otherwise be payable to the bankruptcy estate from the Proctor Estate. The Debtors objected to that proposed settlement and produced, for the first time, a copy of the same alleged forgiveness document dated April 8, 2020 that Ms. Stone had provided the Trustee in September. (Case No. 21-50495, Docket Nos. 39, 42). Facing a sale of the Property along with payment to the Proctor Estate, and despite their stated position in their schedules and at the § 341 meeting, the

Debtors abruptly changed course from their position that the debt owed the Proctor Estate was valid, now contending that the alleged forgiveness document cancelled any obligation to, or lien held by, the Proctor Estate.[7] The Debtors also filed amended schedules to list the secured claim of the Proctor Estate as "disputed." This amendment occurred approximately five months after the petition date, despite knowledge of the forgiveness document since April 2020, well before the petition date.

The Debtors' various explanations for the reasons for the belated disclosure of the forgiveness document are contradictory and incomprehensible. When first asked to identify the person having the original document and whether possession changed at any time, the Debtors responded in writing that "[t]he document was originally in the possession of Betty Proctor. The writing was left in the possession of Lee Hepler subsequent to her hospitalization and death." (Ex. 16, ¶ 8). At trial, however, Mr. Hepler initially testified that he had in fact delivered the purported forgiveness document to a local attorney for assessment; upon learning it was invalid, Mr. Hepler then instructed that attorney to shred it. Despite testifying that the original was destroyed, upon cross-examination by his own counsel, Mr. Hepler conceded that he did in fact have the original version of the forgiveness document, which he recovered after the filing of his bankruptcy case. Mr. Hepler's about-face

---

[7] The Trustee also introduced evidence at trial that in October 2021, prior to revealing the purported forgiveness document, Mr. Hepler was negotiating directly with Stone via text message, attempting to convince her to "wait several years to demand payment of the mortgage on [the Property]." (Ex. 17). The Debtor confirmed through his testimony that he did send the texts at issue, but never suggested to Stone at that time a belief that the debt had been forgiven. (Docket No. 26).

8

reversal on who possessed the forgiveness document, as well as the status of the original version, was emblematic of Hepler's bewildering testimony, which was often evasive and lacking in credibility.[8]

Mr. Hepler admitted that he knew of the existence of the purported loan forgiveness document at the filing of the bankruptcy case and during the § 341 meeting, but did not disclose that fact at the time:

> Mr. Bruton: All right. Well, let me ask you this. At any time during your 341 testimony, did you ever suggest to anybody that the note to the Proctor Estate had been forgiven and was no longer owed at all?
>
> Mr. Hepler: No.
>
> Mr. Bruton: And did you ever suggest that fact in your bankruptcy schedules at all?
>
> Mr. Hepler: No.
>
> ….
>
> Mr. Bruton. But my question is, essentially you knew that the document existed all along. Right? I mean, going back to April 8th, 2020, you knew that the document existed?
>
> Mr. Hepler: It had existed, yes. But I believed it had been destroyed.
>
> Mr. Bruton: The original?
>
> Mr. Hepler: Yes.

(Docket No. 26).

---

[8] Mr. Hepler's testimony at trial was riddled with gaps, inconsistencies, and misleading statements. By way of example, Mr. Hepler initially testified that he did not know his mother had approximately $200,000 in 2020 as he "did not get into [Ms. Proctor's] business except to – I used her credit card to buy groceries when she was living with us, and that was just her part of the family budget." Upon further questioning, however, Mr. Hepler admitted that he transferred his mother's money to his own accounts in 2020, in part for various home renovations "that would have lifted her spirits." Mr. Hepler did not deny transferring the money, claiming only that "it's a long story." (Docket No. 26).

Confusingly, Mr. Hepler offered the same rationale both for initially omitting any reference to the forgiveness document and then later producing the document during the bankruptcy case:

> Mr. Bruton: So my question is did you have a copy of this [loan forgiveness] document all along?
>
> Mr. Hepler: I didn't have one. I deleted it. But I later found an email chain where I sent [the attorney] an email with that attached. I did not realize that I had that. But even having it, I would not submit it because it would be construed as fraud. It would be –
>
> Mr. Bruton: – Why did you submit it later?
>
> Mr. Hepler: To protect myself from being charged with fraud.
>
> Mr. Bruton: Well, no, no, no, no. You just said you didn't submit it initially because there had been allegations that it was fraudulent. Right?
>
> Mr. Hepler: Well, the problem is, if – without the original document, I cannot prove that it is not a document I created. Therefore, it could be construed as fraud, therefore, I would not submit a document that would give the appearance of fraud.
>
> Mr. Bruton: But you did.
>
> Mr. Hepler: I submitted the original document that my mother signed that came into my possession two days before I showed it to Mr. Dick. We were having court, and the house was going to be sold …

(Docket No. 26).

Based on the evidence presented at trial, there is no dispute that the Debtors made multiple false statements and omissions on their bankruptcy schedules and at the § 341 meeting. Critically, the Debtors did not disclose or reference the alleged forgiveness document at the outset of the bankruptcy case, instead portraying the debt held by the Proctor Estate as valid and owing. In fact, Mr. Hepler specifically testified that his mother did not get a chance to forgive the debt before she died. Regardless of its potential validity in probate proceedings, the Debtors were aware

10

of the existence of the forgiveness document but did not disclose it to the Court, the Trustee, or other interested parties until the eve of the proposed sale of the Property; since that time, the Debtors have offered conflicting and discordant explanations both for the initial concealment and why they eventually produced the document. The Plaintiffs contend that these omissions and false statements warrant denial of discharge under 11 U.S.C. § 727(a).

## DISCUSSION

Section 727 of the Bankruptcy Code provides that a bankruptcy court "shall grant the debtor a discharge," which is in line with the "Code's purpose of giving honest debtors a fresh start unhampered by the pressure and discouragement of preexisting debt." *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994). To curtail those who would "play fast and loose with their assets or with the reality of their affairs," *id.* (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)), the same section of the Code provides twelve scenarios in which a debtor would not be entitled to a discharge. *Van Robinson v. Worley*, 849 F.3d 577, 583 (4th Cir. 2017).

The Plaintiffs request that the Court deny the Debtors a discharge under several of those exceptions, including § 727(a)(4)(A), which provides that a court should not grant a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The purpose of the section is to ensure that accurate and complete information is supplied for those interested in the administration of the bankruptcy

estate and that trustees and creditors are spared "having to undertake time-consuming investigations into the existence of every asset or costly audits of property whose value cannot be fixed at a glance." *Van Robinson*, 849 F.3d at 583; *see also Tully*, 818 F.2d at 110 ("Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."). Although § 727(a)(4)(A) "is ordinarily construed liberally in the debtor's favor," *Van Robinson*, 849 F.3d at 583, a debtor has an affirmative duty to list all assets and liabilities and to fully answer the questions in the petition. *Miller v. Jeffries (In re Jeffries)*, 541 B.R. 317, 325 (Bankr. M.D.N.C. 2015).

To prove a violation § 727(a)(4), the plaintiff must show a debtor "made a statement under oath which he knew to be false, must have made the statement willfully, with intent to defraud, and the statement must have related to a material matter." *Van Robinson*, 849 F.3d at 583 (cleaned up); *see also Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987). "Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact." *Williamson*, 828 F.2d at 251. The plaintiff bears the burden of proving that the discharge should be denied under § 727(a)(4) and must meet this burden by a preponderance of the evidence as to all elements. *See* Fed. R. Bankr. P. 4005; *Farouki*, 14 F.3d at 249; *Jeffries*, 541 B.R. at 324. Once it reasonably appears that debtor has made a false oath, the burden falls on the debtor "to come forward with evidence that he has not committed the offense charged." *Tully*, 818 F.2d at 110.

12

As described in more detail above, the Debtors made false statements and omissions under oath in several instances. Because bankruptcy schedules are signed under penalty of perjury, a false statement or omission therein qualifies as a false oath. *See Van Robinson*, 849 F.3d at 584; *Jeffries*, 541 B.R. at 324 (citing *Nationsbank, N.A. v. Jaray (In re Jaray)*, 114 F.3d 1176, 1176 (4th Cir. 1997) (per curiam); *Williamson*, 828 F.2d at 251 n.2. Similarly, false statements or omissions offered as part of testimony under oath at the § 341 meeting of creditors may qualify as false oaths. *See, e.g.*, 6 COLLIER ON BANKRUPTCY ¶ 727.04(3) (16th ed. 2022); *Jaray*, 114 F.3d at 1176; *In re Korte*, 262 B.R. 464, 473-74 (B.A.P. 8th Cir. 2001); *In re Ball*, 84 B.R. 410, 413 (Bankr. D. Md. 1988). The Debtors' statements in the schedules and at the § 341 meeting as to the amount and validity of the debt owed to the Proctor Estate were false based on the knowledge the Debtors possessed at that time. The Debtors' statement that Ms. Proctor did not get a chance to forgive the debt before her death, and the omission of any reference to a forgiveness document, in both the schedules and in testimony at the meeting of creditors, further qualify as false statements for purposes of § 727(a)(4)(A).

Whether the Debtors knew their statements and omissions were false and whether such statements and omissions were made with the requisite intent "are largely matters of credibility and demeanor." *Jeffries*, 541 B.R. at 326; *Williamson*, 828 F.2d at 252. "Because a debtor is unlikely to testify directly that his intent was fraudulent," such intent may be established in one of two ways: first fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a

13

course of conduct, *Williamson*, 828 F.2d at 252; *see also Van Robinson*, 849 F.3d at 585 (finding court may infer fraudulent intent from the debtor's "background, course of conduct, and absence of credibility"); second, fraudulent intent can be shown through reckless indifference to the truth, which "constitutes the functional equivalent of fraud." *Van Robinson*, 849 F.3d at 585 (cleaned up). "While any single omission or error may be the result of an innocent mistake, multiple inaccuracies are evidence of a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A)." *Nicholson v. Spearman (In re Spearman)*, No. 17-00202, 2020 WL 6876840, at *8 (Bankr. D. Md. June 18, 2020); *see also Kremen v. Slattery (In re Slattery)*, 333 B.R. 340, 346 (Bankr. D. Md. 2005).

Given this standard, and after review of the evidence and testimony provided, the Court may reliably infer the Debtors' knowledge and fraudulent intent based on several grounds. First, the content of Mr. Hepler's testimony at trial and his observable lack of candor demonstrate a sufficient basis for finding fraudulent intent. Mr. Hepler admitted at trial that he was aware of the existence of the forgiveness document when reviewing his schedules and offering statements at the meeting of creditors yet did not disclose that information to anyone at that time. After careful observation at trial, the Court further finds Mr. Hepler to be an unreliable witness lacking in credibility; his explanations for why he initially concealed the existence of the forgiveness document and then later disclosed it are at once inconsistent, insufficient, and, frankly, perplexing. The Court is still unable

14

to discern the precise timing for the creation of the forgiveness document, the consultation with the local attorney, the delivery of the document to that attorney, and its eventual recovery and production in the Debtors' bankruptcy case. The Court finds Mr. Hepler's stated concern for fraud and his professed ignorance to be disingenuous and self-serving. Accordingly, Mr. Hepler's testimony strongly supports a finding of fraudulent intent, which "depends largely upon an assessment of the credibility and demeanor of the debtor." *Van Robinson*, 849 F.3d at 585.

Second, the Court finds the Debtors' course of conduct in the bankruptcy proceeding further demonstrates fraudulent intent. When combined with their asserted homestead exemptions and two senior mortgages, the Debtors' decision to schedule the Proctor Estate debt as valid and undisputed, with no mention of the forgiveness document, was seemingly an attempt to persuade the Trustee that this was a "no asset" case. The Trustee testified that his initial impression, based in large measure on the assumed validity and amount of the Proctor Estate debt, was that "it was probably going to be a no-asset case." (Docket No. 26). Only after the Trustee attempted to sell the Property and satisfy the debt owed to the Proctor Estate did the Debtors "rediscover" the forgiveness debt and assert its validity. Again, the Court finds Mr. Hepler's explanations for the sequence of events to be incredible; the more likely explanation is that the Debtors' failure to mention the forgiveness document was designed to persuade the Trustee and creditors to abandon the Property. *See Van Robinson*, 849 F.3d at 586; *see also In re Pynn*, 546 B.R. 425, 431 (Bankr. C.D. Cal. 2016) ("[D]ebtor approached his bankruptcy

15

schedules seemingly with the idea of persuading his creditors that these assets were of no value to creditors because they were, cumulatively, worth less than the statutory exemptions.").

Third, the Debtors' pattern of making false statements and omitting information bolsters a finding of fraudulent intent. *See Williamson*, 828 F.2d at 252 ("It is significant that Williamson made not one false oath, but three …"). This is not an instance where the Debtors made one false oath and were otherwise forthcoming. Rather, the Debtors made numerous false oaths in both the schedules and at the § 341 meeting as to the validity and amount of the Proctor Estate debt, while specifically omitting any reference to a forgiveness document they would later assert was effective. This pattern continued at trial where Mr. Hepler frequently contradicted his own previous testimony and responses to interrogatories while providing incomplete and misleading explanations.[9]

Collectively, the Court interprets the Debtors' long track record of misstatements and omissions, their course of conduct in the bankruptcy case, and Mr. Hepler's lack of candor at trial to be sufficient to demonstrate, by the preponderance of the evidence, the Debtors' knowledge and fraudulent intent.[10]

---

[9] Again, the Court notes that the Debtors did not call any witnesses or introduce any exhibits into evidence at trial.

[10] At times during his testimony, Mr. Hepler seemed to imply that any omissions or misstatements in the schedules or at the § 341 meeting was attributable to his bankruptcy attorney. (Docket No. 26). "While reliance on counsel generally absolves a debtor of fraudulent intent, the bankruptcy court must still consider whether the debtor acted in good faith. A debtor must demonstrate that he provided the attorney with all of the necessary facts and documentation." *Van Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017) (cleaned up). Here, Mr. Hepler's testimony at trial demonstrated that the Debtors did not inform Mr. Dick of the existence of the forgiveness document until after the meeting of creditors, shortly before the planned sale of the Property. Therefore, the Court cannot

The Court also finds the Debtors' statements and omissions related to a material matter. "The subject matter of a false oath is 'material' and thus sufficient to bar discharge if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets or business dealings, or the existence and disposition of property." *Williamson*, 828 F.2d at 252 (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). "The threshold to materiality is a low bar," as the statute makes clear that a fraudulent misstatement "in or in connection with the case" is sufficient grounds for the denial of discharge. *Van Robinson*, 849 F.3d at 586 (citing 11 U.S.C. § 727(a)(4)(A)). Here, the Debtors' misstatements as to the amount, nature, and validity of the Proctor Estate debt, which in turn impact the availability of assets to pay creditors, are undeniably material and relevant to the bankruptcy estate.

The Court is cognizant that "[d]enial of discharge is a severe sanction and should be reserved for instances in which a debtor contravenes the basic compact underlying the Code's promise of a 'fresh start.'" *Van Robinson*, 849 F.3d at 587-588. Nevertheless, after careful consideration of the evidence, including Mr. Hepler's testimony at trial, the Court finds that the Plaintiffs have satisfied their burden and demonstrated the required elements necessary to deny the Debtors' discharges under § 727(a)(4)(A).[11]

---

find that the Debtors provided their counsel with all necessary facts and documentation. Accordingly, the Court will reject any advice-of-counsel defense that Mr. Hepler may have been insinuating during his testimony.

[11] Because the Court finds the Plaintiffs have met their respective burden under 11 U.S.C. § 727(a)(4)(A), it need not evaluate the Plaintiffs' alternative arguments pertaining to the denial of the Debtors' discharges under other portions of § 727(a).

17

## CONCLUSION

Based upon the foregoing, the Court finds that the Trustee and the Bankruptcy Administrator have met their burden under § 727(a)(4)(A). The Court shall enter a separate judgment consistent with this memorandum opinion denying the Debtors' discharges.

March 30, 2023

_Lena Mansori James_
Lena Mansori James
United States Bankruptcy Judge

# PARTIES TO BE SERVED

William P. Miller, United States
Bankruptcy Administrator, and
Daniel C. Bruton, Trustee

Plaintiffs,

v.

Lee Anderson Hepler and
RaDonna Ruth Hepler,

Defendants.

Adv. Pro. No. 22-06003

William P. Miller, Bankruptcy Administrator
via cm/ecf

Daniel C. Bruton on behalf of Plaintiff Daniel C. Bruton
via cm/ecf

Stan H. Dick on behalf of Defendants Lee Anderson Hepler and RaDonna Ruth Hepler
via cm/ecf

Lee Anderson Hepler and RaDonna Ruth Hepler
400 Shelia Avenue
Interlachen, FL 32148